**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UAB SKYROAD LEASING,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No. 20-cv-00763 (APM)** |
| ) | |
| **OJSC TAJIK AIR,** ) | |
| ) | |
| **Respondent.** ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Petitioner UAB Skyroad Leasing ("Skyroad") brings this action to enforce a 2018 arbitral award against Respondent OJSC Tajik Air ("Tajik Air") issued by the Vilnius Court of Commercial Arbitration ("VCCA") in Vilnius, Lithuania.  The VCCA tribunal awarded Skyroad $20,216,425.54 in damages, and €78,700.58 and $6,773.60 in legal costs, plus interest.  Tajik Air has yet to pay any amount of the award, and appears in this matter to contest the court's jurisdiction over it.  Tajik Air contends that personal jurisdiction is lacking because (1) Skyroad failed to execute service of process consistent with the requirements of the Foreign Sovereign Immunities Act ("FSIA"), and (2) jurisdiction over Tajik Air cannot be exercised consistent with the requirements of the Due Process Clause of the Fifth Amendment.  Tajik Air demands dismissal of Skyroad's petition.

Under the FSIA, Tajik Air is considered an instrumentality of a foreign state—the Republic of Tajikistan is the company's sole shareholder.  As an instrumentality, Tajik Air is presumed to be separate from its foreign-state owner and, under Circuit precedent, enjoys the protections of the Due Process Clause of the Fifth Amendment.  That presumption is rebuttable, however, and can

be overcome by a showing that Tajikistan completely dominates Tajik Air or that Tajik Air is an agent of the sovereign, or that recognizing Tajik Air as a separate entity would work fraud or injustice.  Skyroad attempts to make these showings, but its evidence falls short.  It demonstrates neither an unusual degree of control by Tajikistan over Tajik Air nor that recognizing separateness work fraud or injustice.  Accordingly, for the court to exercise personal jurisdiction over Tajik Air consistent with the Due Process Clause, the company must have sufficient minimum contacts with the United States.  The record reveals none.  Therefore, the court grants Tajik Air's motion to dismiss.  The court does not reach Tajik Air's claim of improper service.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   The Aircraft Leases

Respondent Tajik Air is an airline company wholly owned by the Republic of Tajikistan ("Tajikistan").   *See* Compl./Pet. to Confirm, Recognize, & Enforce Foreign Arb. Award, ECF No. 1 [hereinafter Pet.], ¶ 8.  Formerly a state-owned enterprise known as "State Unitary Aviation Enterprise Tajik Air," *id.*, the company was restructured as an open joint stock company by government resolution on December 30, 2009, *see* Resp't's Mot. to Dismiss, ECF No. 12 [hereinafter Resp't's Mot.], Decl. of Dilshod Ismatullozoda, ECF No. 12-2 [hereinafter Ismatullozoda Decl.], Ex. A, ECF No. 12-3 [hereinafter Articles of Ass'n], ¶ 1.  The government of Tajikistan retained 100 percent ownership of Tajik Air's voting shares.  *See id.* ¶ 8.

Shortly before the State Unitary Aviation Enterprise Tajik Air was privatized, in September 2009, it entered into two identical lease agreements with a Lithuanian company called AB Avia Asset Management for the lease of two Boeing aircraft.  *See* Pet. ¶¶ 15, 17.  The agreements required Tajik Air to pay monthly rent of $149,000 for each aircraft and to return the two aircraft

at the end of the 60-month lease period.  *Id*. ¶ 17.  On November 2, 2010, AB Avia Asset Management transferred all rights and obligations under the lease agreements to UAB AviaAM B03, which later became UAB Skyroad Leasing.  *Id.* ¶ 16.

As relevant here, the lease agreements contained an arbitration clause providing that "[a]ny dispute, controversy or claim arising out of or relating to th[e] Finance Lease shall be settled by Arbitration in the Vilnius Court of Commercial Arbitration in accordance with its Rules."  *Id.* ¶ 19; *see* Mem. of P. & A. in Supp. of Pet. to Confirm Award, ECF No. 4, Decl. of Michael S. Cryan, ECF No. 4-1 [hereinafter Cryan Decl.], Ex. B, Aircraft Finance Lease Agreement, ECF No. 4-3 [hereinafter Lease Agreement], at 101.  The arbitration clause further identified Vilnius, Lithuania, as the seat of arbitration and called for all proceedings to be conducted in English, using the substantive law of the Republic of Lithuania.  Pet. ¶ 19; Lease Agreement at 101.

### 2.  *The Arbitration Award*

In 2013, after Tajik Air started falling behind on the monthly lease payments, Skyroad initiated arbitration proceedings pursuant to the agreements, resulting in an award of $2,824,000 plus interest.  *See* Cryan Decl., Ex. A., Final Arb. Award, ECF No. 4-2 [hereinafter Award], ¶ 7. When Tajik Air remained delinquent on payments and failed to return the aircraft at the end of the leases, Skyroad initiated a second arbitration proceeding with the VCCA tribunal on September 5, 2017, whose ultimate award is the subject of this action.  *See id.* ¶ 8; Pet. ¶ 21.

Tajik Air, at first, appeared before the arbitral tribunal.  On October 31, 2017, represented by the Head of the Legal Department of Tajikistan's Ministry of Transport, Zafar Khafizov, *see* Pet. ¶ 22, Tajik Air filed a statement of counterclaim challenging the tribunal's jurisdiction over the dispute, *see* Award ¶ 39.  Specifically, Tajik Air argued that the tribunal should declare the arbitration agreement invalid under Article 12(3) of the Law on Commercial Arbitration of the

3

Republic of Lithuania.  *See id.* ¶¶ 64–65.  Article 12(3) provides that disputes involving "a state or municipal enterprise or an institution or organisation" may not be referred to arbitration without the consent of the founder of such an entity.  *Id.* ¶ 71.  Tajik Air argued that the arbitration agreements in the Skyroad leases were unenforceable because the company was a state enterprise at the time it entered the agreement, and it never obtained the consent of its founder, the government of Tajikistan, to enter the arbitration agreement.  *See id.* ¶ 65.

But Tajik Air's appearance before the tribunal was short lived.  Mr. Khafizov failed to pay the required fees associated with the counterclaim on behalf of Tajik Air.  *See id.* ¶¶ 46, 52, 65–66.  Indeed, he appears to have absconded with those funds and has since fled the country.  *See* Reply Mem. in Supp. of Resp't's Mot. to Dismiss, ECF No. 14 [hereinafter Resp't's Reply], Second Decl. of Dilshod Ismatullozoda, ECF No. 14-1 [hereinafter 2d Ismatullozoda Decl.], ¶ 10–11.  As a consequence, the arbitral tribunal did not consider Tajik Air's counterclaim.  *See* Award ¶ 66.  Nor did Tajik Air otherwise contest Skyroad's claims—it did not appear at the merits hearing held before the VCCA tribunal on March 12, 2018.  Only Petitioner was in attendance.  *See* Award ¶¶ 31, 59.

Although Tajik Air's counterclaim was not formally before it, in the Final Award the tribunal nevertheless sua sponte considered Tajik Air's jurisdictional argument but rejected it on two primary grounds.  *See id.* ¶¶ 64–66, 68–82.  First, the tribunal found that the restrictions of Article 12(3) of the Law on Commercial Arbitration were "designed to apply to [] Lithuanian State entities and institutions, [ ] not [] foreign ones" like Tajik Air, which was "an entity established under the laws of the Republic of Tajikistan."  *Id.* ¶ 72.  Second, even if Tajik law limited Tajik Air's authority to enter arbitration agreements, the tribunal found it to be a widely recognized principle of international commercial arbitration that a state enterprise may not invoke national

4

law to question the jurisdiction of an arbitration tribunal or the right of the entity to arbitrate. *See id.* ¶ 74 & n.29; Cryan Decl., Ex. C, Stmt. of Appeal of Tajik Air, ECF No. 4-4 [hereinafter Stmt. of Appeal], at ¶ 6.   Accordingly, the tribunal held that Article 12(3) had no bearing on the validity of the arbitration agreement.  *See* Award ¶ 75.   On April 25, 2018, the tribunal awarded Skyroad $20,216,425.54 in damages at eight percent interest from September 5, 2017, plus two awards of legal costs of €78,700.58 and $6,773.56.  *See id.* ¶ 165; Pet. ¶¶ 29–31.

Following the tribunal's decision, Tajik Air initiated annulment proceedings before the Court of Appeal of Lithuania.  *See* Pet. ¶ 34; Stmt. of Appeal.   There, Tajik Air renewed its jurisdictional arguments grounded in Article 12(3) of the Law on Commercial Arbitration, arguing that the VCCA tribunal misapplied the law and lacked jurisdiction over the dispute.  *See* Stmt. of Appeal ¶¶ 7–27.   The Court of Appeal rejected Tajik Air's arguments, upheld the legal findings of the VCCA tribunal, and affirmed the award on July 31, 2018.  See Pet. ¶ 34; Cryan Decl., Ex. D, Decision of the Court of Appeals of Lithuania, ECF No. 4-5, ¶¶ 45, 48.

## B.  Procedural Background

After extensive efforts to get Tajik Air to pay the award to no avail, *see* Cryan Decl., Ex. J., Aff. of Audrius Dzikevičius, ECF No. 4-11, Skyroad initiated this action on March 18, 2020, to confirm, recognize, and enforce the arbitral award in the United States, *see* Pet.  On March 23, 2020, Petitioner filed an emergency motion requesting authorization to serve process on Tajik Air through alternative means pursuant to 28 U.S.C. § 1608(b)(3)(C).  *See* Emergency Mot. to Serve Resp. via Alt. Mode of Service, ECF No. 7.  As pertinent here, that provision authorizes service of process upon an instrumentality of a foreign state, "if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint . . . as directed by order of the court consistent with the law of the place where service is to be made."  28 U.S.C. § 1608(b)(3)(C).  The court

granted Skyroad's motion and authorized it to serve Tajik Air via one or all of four specific alternative methods of service, or by "any other method 'reasonably calculated to give actual notice.'" Order, ECF No. 8.  On March 24, 2020, Skyroad filed a Declaration of Service stating that it had caused a copy of the Summons and Petition to be sent to Tajik Air at various mail and email addresses.  *See* Decl. of Service, ECF No. 10.

On May 26, 2020, Tajik Air moved to dismiss the Petition on two grounds: inadequate service and lack of personal jurisdiction.   *See* Resp't's Mot. to Dismiss, ECF No. 12 [hereinafter Resp't's Mot.], at 1.  Specifically, Tajik Air argues that the alternative modes of service employed by Skyroad are not permitted under section 1608(b)(3)(C) because they are not "consistent with the law of the place," Tajikistan, "where service is to be made"; accordingly, the court lacks personal jurisdiction over Tajik Air under section 1330(b) of the FSIA, 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction . . . [and] where service has been made. . . . "). *See* Resp't's Mot., Mem. of P. & A. in Supp. of Resp't's Mot. to Dismiss, ECF No. 12-1 [hereinafter Resp't's Br.], at 1.  Additionally, Tajik Air contends that even if service was properly effected, it lacks sufficient minimum contacts with the United States to satisfy the Fifth Amendment's Due Process Clause.  *Id.*  The court heard oral argument on the motion on January 12, 2021.  *See* Minute Order, Jan. 12, 2021.

## II.   LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for personal jurisdiction.  *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  A plaintiff can survive a motion to dismiss if she makes a "prima facie" showing of personal jurisdiction.  *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir.

1991). "[T]o establish a prima facie case, plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court.  Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). The court resolves all factual discrepancies in the record in favor of the plaintiff.  *See Crane*, 894 F.2d at 456.

In cases arising under the FSIA, "[t]o the extent that jurisdiction depends on particular factual propositions . . . , the plaintiff must, on a challenge by the defendant, present adequate supporting evidence." *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990) ("[T]he *plaintiff* bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding [an] agency relationship [under the FSIA].").  In such cases, "plaintiffs must demonstrate the jurisdictional prerequisites by a preponderance of the evidence before the case goes forward." *Agudas Chasidei Chabad*, 528 F.3d at 939; *see also Owens v. Republic of Sudan*, 864 F.3d 751, 784 (D.C. Cir. 2017) (applying preponderance of evidence standard to jurisdictional question under the FSIA), *vacated on other grounds sub nom.*, *Opati v. Sudan*, 590 U.S. ___, 140 S. Ct. 1601 (2020); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 145–46 (3d Cir. 2019) (articulating preponderance-of-the-evidence standard for jurisdictional inquiries involving the presumption of separateness).

## III.   DISCUSSION

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (internal quotation marks omitted).  The statute defines a "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  To qualify

as "[a]n 'agency or instrumentality of a foreign state,'" the entity must be (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof"; and (3) "neither a citizen of a State of the United States . . . nor created under the laws of any third country." *Id.* § 1603(b). Here, the parties agree that Tajik Air, which is incorporated under the laws of Tajikistan and fully owned by the state, qualifies as an instrumentality of a foreign state. *See* Pet. ¶ 8 (alleging that "Tajik Air is thus to be treated as an agency or instrumentality of the foreign state of the Republic of Tajikistan"); Resp't's Br. at 11 (claiming to be a "'typical government instrumentality'"); Mem. in Opp'n to Resp't's Mot. to Dismiss, ECF No. 13 [hereinafter Pet'r's Opp'n], at 1 (noting that Respondent admits it is an agency or instrumentality).

Under section 1330(b) of the FSIA, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction . . . [and] where service has been made." 28 U.S.C. § 1330(b).[1] Skyroad contends that the jurisdictional inquiry begins and ends with these *statutory* requirements.[2] Relying on *Price v. Socialist People's Libyan Arab Jamahiriya*, Skyroad argues that the court need not undertake any *constitutional* jurisdictional inquiry because Tajik Air has no Fifth Amendment due process rights because it is, by definition, a "foreign state" under the FSIA. *See* Pet'r's Opp'n at 2–3, 18–22

---

[1] There is no dispute that the court has subject matter jurisdiction over this matter under 28 U.S.C. § 1605(a)(6)(B), the exception to sovereign immunity for any action brought to confirm an arbitration award that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." *See* Pet'r's Opp'n at 2 ("This Court has subject matter jurisdiction because Tajik Air is a foreign agent or instrumentality of Tajikistan" and this is an "action to confirm . . . [a] New York Convention arbitral award[]."); Resp't's Br. at 7 (noting proper service as the missing component of personal jurisdiction under 28 U.S.C. § 1330(b)).

[2] As noted at the outset, the court does not reach Tajik Air's argument that Skyroad's service efforts fell short of the requirements of the FSIA.

(citing *Price*, 294 F.3d at 96 ("[F]oreign states are not 'persons' protected by the Fifth Amendment.")).  But that argument is outdated and patently contradicts a long line of D.C. Circuit precedent that is binding on this court.

In *TMR Energy Ltd. v. State Property Fund of Ukraine*, the D.C. Circuit made clear that the holding in *Price* "applies only to 'an actual foreign government.'"   411 F.3d 296, 300 (D.C. Cir. 2005).  Where a case involves an "agency or instrumentality" of a foreign state, however, courts afford the instrumentality a "presumption of separateness" from the foreign sovereign.  *See GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 814 (D.C. Cir. 2012); *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* (*Bancec*), 462 U.S. 611, 626–27 (1983) ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."), *abrogated on other grounds by* 28 U.S.C. § 1610.  For purposes of personal jurisdiction, that presumption means that, unless rebutted, the instrumentality is entitled to due process protection under the Fifth Amendment.  *See TMR Energy*, 411 F.3d at 301.  And such protection means that, unless the instrumentality has sufficient minimum contacts with the United States, the court lacks personal jurisdiction over it.  *See GSS Grp.*, 680 F.3d at 810 n.3 ("In actions under the Foreign Sovereign Immunities Act, the relevant frame of reference for the minimum contacts analysis is the United States as a whole, rather than the specific jurisdiction in which the suit is filed (here, the District of Columbia).").

In this case, it is not hard to understand why Tajik Air is entitled to such a presumption of separateness.  The Supreme Court's decision in *Bancec* explains why.  There, the Court observed:

> A typical government instrumentality, if one can be said to exist, is
> created by an enabling statute that prescribes the powers and duties
> of the instrumentality, and specifies that it is to be managed by a

> board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*Bancec*, 462 U.S. at 624. Tajik Air certainly seems to fit this bill. It was restructured from a state enterprise to an open joint stock company by government resolution in 2009. *See* Articles of Ass'n ¶ 1. According to its Articles of Association, the company is authorized to open bank accounts, operates on an independent balance sheet, and may "acquire and exercise its proprietary rights and personal non-property rights, incur obligations and litigate." *Id.* ¶¶ 11–12. These features are the hallmark of separateness from a sovereign.

Skyroad concedes that Tajik Air lacks sufficient minimum contacts with the United States to satisfy the Due Process Clause. *See* Pet'r's Opp'n at 22. Therefore, the dispositive question for the court is whether Skyroad has produced sufficient evidence to overcome the presumption of separateness afforded Tajik Air under *Bancec*. *See Foremost-McKesson, Inc.*, 905 F.2d at 447 ("[T]he *plaintiff* bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship."). *Bancec* provides the "exclusive means for determining whether [the presumption of separateness has been overcome and accordingly whether] a foreign, state-owned corporation is a 'person' for Fifth Amendment purposes." *GSS Grp.*, 680 F.3d at 816. Skyroad may make such a showing in one of two ways: 1) by demonstrating that Tajikistan "so extensively control[s]" Tajik Air that "a relationship of principal and agent is created," *Bancec*, 462 U.S. at 629, or 2) by showing that "recognition of [Tajik Air] as an entity apart from the state 'would work fraud or injustice,'" *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200

F.3d 843, 848 (D.C. Cir. 2000) (quoting *Bancec*, 462 U.S. at 629).   The court discusses these exceptions to the presumption of separateness in turn and concludes that Skyroad has failed to carry its burden as to either.

### A.   Extensive Control

In *Transamerica Leasing, Inc. v. La Republica de Venezuela*, the D.C. Circuit identified "two distinct contexts" in which "[c]ontrol by the sovereign is relevant" to the inquiry of whether *Bancec's* principal-agent exception is satisfied.  200 F.3d at 848–49.  First, the court explained, "control is relevant when it significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary," such that it amounts to "complete domination."  *Id.* at 848. In such circumstances, there is no meaningful distinction between the sovereign and its instrumentality; "they act as one."  *Id.*

The second relevant context is "when the sovereign exercises its control in such a way as to make the instrumentality its agent."  *Id.* at 849.  "The relationship of principal and agent depends . . . upon the principal having 'the right to control the conduct of the agent with respect to matters entrusted to [the agent]."  *Id.* (quoting Restatement (Second) of Agency § 14 (1958)).  How much control a foreign state must exert over an instrumentality before a principal-agent relationship is recognized defies precise line drawing.  *See id.* ("Courts have long struggled, often with confusing results, to explain how much control is required before parent and subsidiary may be deemed principal and agent."); *cf. Berkey v. Third Ave. Ry. Co.*, 155 N.E. 58, 61 (N.Y. 1926) ("The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor.").   The D.C. Circuit has stated, however, that "at a minimum" the "relationship of principle and agent does not obtain unless" the following four factors are present:

> [1] the parent has manifested its desire for the subsidiary to act upon
> the parent's behalf, [2] the subsidiary has consented so to act, [3] the
> parent has the right to exercise control over the subsidiary with
> respect to matters entrusted to subsidiary, and [4] the parent
> exercises its control in a manner more direct than by voting a
> majority of the stock in the subsidiary or making appointments to
> the subsidiary's Board of Directors.

*Transamerica Leasing*, 200 F.3d at 849.

Skyroad offers a host of facts that it claims show that Tajikistan's control over Tajik Air goes beyond that of a typical instrumentality. *See* Pet'r's Opp'n at 23–26; Hr'g Tr. (draft), Jan. 12, 2021 [hereinafter Hr'g Tr.], at 41–46. These facts, Skyroad asserts, demonstrate that Tajikistan so extensively controls Tajik Air that the company lacks a distinct identity or, alternatively, that it is a government agent. *See, e.g.*, Pet'r's Opp'n at 28 ("Tajik Air is one and the same as the foreign state."); *id.* at 22–23 ("Tajik Air is an agent of the foreign state of Tajikistan."); *id.* at 27–28 (citing Tajikistan's "complete domination" over Tajik Air). These facts may fairly be grouped into two primary categories: 1) Tajik Air's corporate structure and economic relationship with the government of Tajikistan, and 2) Tajik Air's actions in the underlying arbitration. Hr'g Tr. at 41–46.

### 1. Corporate Structure and Economic Relationship with the State

Skyroad argues that the following facts overcome the presumption of separateness between Tajik Air and the state: 1) the government of Tajikistan is the company's founder and owns 100% of its voting shares; 2) "the Government makes decisions on disbursement of dividends or profits to the Republic of Tajikistan"; 3) the company's "Director General is appointed and dismissed by the State"; 4) the Supervisory Board of the company, which appears to function as a board of directors, includes senior government officials, including the Prime Minister; 5) the government is "solely responsible for the purchase, lease, and funding of aircraft"; 6) Tajik Air is funded by

the government; and 7) the government has reduced Tajik Air's debts through tax offsets for Tajik Air's third-party creditors.  Pet'r's Opp'n at 24; Hr'g Tr. at 41–42, 45–46.  These facts, taken as a whole, fall short of overcoming the presumption that Tajik Air is separate from its sovereign owner.

The first and third facts—Tajikistan's 100% ownership control and its authority to appoint and fire the company's Director General—"are relevant but as a matter of law do not by themselves establish the required control." *Transamerica Leasing*, 200 F.3d at 851.  That was the conclusion of the D.C. Circuit in *Transamerica Leasing* when confronted with similar claimed indicia of control.  There, the court found that the government of Venezuela's stock ownership and its power to appoint the company's Board of Directors and senior executives, alone, did not "establish the required control." *Id.*; *see also Foremost-McKesson*, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent  under FSIA.").

The second and fifth facts—the government's role in making disbursements of dividends or profits and its authority over the financing and acquisition of aircraft—also do not move the needle.  *See* Articles of Ass'n ¶ 32 (stating that the "decision on payment and amount of dividends from the annual shares of the Company should be made by the Founder according to the procedure established by legislation of the Republic of Tajikistan"), *id.* ¶ 39 (granting the sole shareholder "exclusive competence" over "making decision on approval of transactions to the extent stipulated by the Legislation, including the agreements on purchase and lease of the aircraft and receiving of bank loans").  That Tajikistan has the final say in distributing dividends is hardly a surprise given its sole shareholder status.  "Indeed, it is a 'necessary corollary' of the settled principle that a state and its instrumentality are presumed to be separate that the 'sovereign . . . may derive benefits

from' its ownership of a state corporation 'yet still avoid amenability to suit in United States courts.'" *OGI Grp. Corp. v. Oil Projects Co. of Ministry of Oil*, No. 19-cv-2619 (APM), 2020 WL 6342886, at *6 (D.D.C. Oct. 29, 2020) (quoting *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 218 (D.D.C. 2014)).   Nor does the sovereign's role in approving the acquisition and financing of aircraft demonstrate a lack of separateness.  *See Seijas v. Republic of Argentina*, No. 4-cv-400 (TPG), 2009 WL 10700009, at *2 (S.D.N.Y. Aug. 19, 2009) ("The role of [government] officials in approving airplane purchases and other large investments in the airline does not amount to the type of day-to-day control necessary to make an alter ego finding.").  The D.C. Circuit recognized as much in *Transamerica Leasing*, where it rejected as evidence of dominant control that the state had approved the sale of three vessels owned by a state-owned shipping company, Compañia Anonima Venezolana de Navegación (CAVN).  *See* 200 F.3d at 851.  The court observed that the state's authorization to sell a portion of CAVN's fleet was part of a "massive restructuring" and thus "hardly qualifie[d]" as the type of control over CAVN's "'day-to-day' business" that might indicate a principal-agent relationship.  *Id.*   Similarly here, that Tajikistan has reserved unto itself the last word in making an extraordinary expenditure like the purchase of aircraft does not exceed the normal supervisory control one would expect from a sole shareholder, nor does it represent control over ordinary day-to-day business decisions.

The sixth and seventh facts—Tajikistan's funding of Tajik Air and its reduction of the company's debt through state action—also do not chip away at Tajik Air's separateness.  As a threshold matter, the evidence presented that Tajikistan *directly* finances Tajik Air's operations is weak.  Skyroad cites to a government resolution, titled "Special Programme of State Support to the Public Limited Liability Company Tajik Air for 2018-2013," adopted in September 2018, for that proposition that the sovereign is "solely responsible" for the "funding of aircraft."  *See* Pet'r's

14

Opp'n at 24 (citing Cryan Decl., Ex. E., ECF No. 4-6 [hereinafter Resolution]).  But that is not what the resolution says.  Rather, it states that funds needed to purchase modern aircraft "shall be *attracted* in coordination with the Government of the Republic of Tajikistan and the Supervisory Board of the public limited liability company Tajik Air."  Resolution ¶ 12 (emphasis added). Elsewhere, the Resolution expressly contemplates that such funding would come from international lenders and would not be guaranteed by the state.  *Id.* ¶ 49 (stating that to secure eight leased aircraft the "Company [must] attract 30.0 million US dollars through international financial organisations over the next three years" "(without a state guarantee)").  The Resolution, therefore, does not establish direct state funding of Tajik Air's operations.

The record reveals that Tajikistan has provided *indirect* financial assistance to Tajik Air. In June 2020, the government passed a resolution reducing Tajik Air's outstanding debt via tax offsets for the company's third-party creditors.  *See* Pl.'s Notice of Suppl. Auth., ECF No. 15, Suppl. Auth., ECF No. 15-1 [hereinafter ASIA-Plus Article], at 1 (announcing government resolution that would offset nearly $2 million in Tajik Air's debt).  Such government action to prop up a wholly owned instrumentality's financial position is not at all unusual, however, and does not constitute excessive control by the state.  On this point, *Transamerica Leasing* is again instructive.  There, the Venezuelan government had decided to inject funds into its wholly owned enterprise, CAVN, as part of a restructuring plan, and another government entity had entered into a trust agreement with CAVN to help CAVN "satisfy its debts and attain liquidity." *Transamerica Leasing*, 200 F.3d at 852.  The court found that "the infusion of state capital to cover CAVN's losses was a normal aspect of the relation between a government and a government-owned corporation, not an instance of 'day-to-day' involvement in the affairs of the corporation." *Id.*  So, too, here.  Tajik Air reportedly "has been on the brink of bankruptcy for many years."  Pet'r's

Opp'n, Ex. I, ECF No. 13-10 [hereinafter Fergana Article], at 1; *see also* ASIA-Plus Article (describing the company's financial position as "complicated," causing it to suspend all flights at the start of 2019).  After it was restructured as a joint stock company in 2009, the company started incurring substantial debt to third-parties, including airports, fueling companies, and on-board catering vendors.  *See* Fergana Article at 2; ASIA-Plus Article at 1.  "Far from demonstrating . . . control" sufficient to satisfy "the principal and agent exception announced in *Bancec*," Tajikistan's efforts to "bail [Tajik Air] out of debt" are a "normal aspect of the relation between a government and a government owned-corporation."  *Transamerica Leasing*, 200 F.3d at 852; *see also Bancec*, 462 U.S. at 624 (recognizing that government "appropriations to provide capital or to cover losses" do not prevent a typical government instrumentality from being considered a separate juridical entity).

What makes this a somewhat closer case than *Transamerica Leasing* is the fourth fact cited by Skyroad:  that the company's Supervisory Board consists of high-ranking government officials.  According to a translated article appended to Skyroad's opposition brief, in July 2018, in response to the company's financial distress, the government of Tajikistan established a "Supervisory Board" comprising thirteen government officials, whose function, as described by the article, was to "be responsible for the effective operations of the Company."  Pet'r's Opp'n at 25; *id.*, Ex. H, ECF No. 13-9 [hereinafter Board Article].  Government officials that sit on the Supervisory Board include, among others, the country's Prime Minister, who heads the Board; the First Deputy Prime Minister; Deputy Prime Minister; and the Ministers of Finance, Transport, and Justice.  *See* Board Article.  Thus, the officials who run the Tajik government run the Supervisory Board.  Skyroad asserts that the fact of interlocking high-ranking government and corporate officials establishes Tajikistan's complete domination of Tajik Air.

16

The court agrees that the presence of high-ranking government officials on Tajik Air's Supervisory Board provides some evidence of the state's control over Tajik Air, but it is not enough on this record to overcome *Bancec*'s presumption of separateness.  The court so concludes for three reasons.

*First*, the D.C. Circuit has long held that the presence of high-ranking government officials on the managing board of a wholly owned state enterprise is not by itself enough to establish the requisite degree of control.  In *Foremost-McKesson*, the court wrote:

> Nor can it be assumed that an official from a state entity who serves on the board of directors of another such entity will act to serve or promote the interests of the sovereign.  Thus, the question concerning an alleged agent/principal relationship between the foreign state and an agency or instrumentality thereof does not involve a meaningless inquiry.

905 F.2d at 448.  *Bancec* illustrates the need for such inquiry.  There, the Governing Board of the Cuban state-owned company "consist[ed] of delegates from Cuban governmental ministries," and the president of the Board (and of the Company) was none other than Ernesto Che Guevara, the Minister of State.  *See Bancec*, 462 U.S. at 615.  Still, the Court found that the entity was presumed to be separate from the sovereign.  *See id.* at 628.[3]  Accordingly, in this case, the presumption cannot be overcome simply because high-ranking government officials of Tajikistan sit on Tajik Air's Supervisory Board.

*Second*, the Supervisory Board appears not to be responsible for Skyroad's day-to-day operations.  *Cf. Transamerica Leasing*, 200 F.3d at 851 (finding the government's appointment of an interim official to run a division of CAVN not sufficient to overcome the presumption of

---

[3] The Court ultimately did not decide whether the presumption was overcome on the basis of a principal-agent relationship, but did find the presumption surmounted because recognizing separateness would have worked an injustice.  *See* 462 U.S. at 630–32.

separateness, where the interim official was left "the task of running 'day-to-day' operations"). According to Tajik Air's counsel, the Supervisory Board referenced in the news article announcing the Board, *see* Board Article, is the same body as the Supervisory Board described in the company's Articles of Association.  *See* Hr'g Tr. at 32–34.  Skyroad offers no evidence to the contrary.  The Articles describe the Supervisory Board's role in largely policy-making terms. Among its functions are defining "the selective engagement policy of the Company," approving the "financial plan of the Company," defining the wages and incentives of executives, distributing and purchasing the Company's securities, setting credit policy, signing off on annual and financial reports, adopting resolutions "on approval of transactions in execution of which there is an interest of the Company," and approving "major transactions, including transactions related to the purchase, leasing any type of aircraft, as well as to the Bank loans."  Articles of Ass'n at 8–10. These are corporate governance functions ordinarily associated with a board of directors of a private enterprise.

By contrast, Tajik Air's day-to-day operations are performed by its Director General, who is "not an employee or official of the Government of the Republic of Tajikistan."  Ismatullozoda Decl. ¶ 1; Articles of Ass'n at 11.  His "[c]ompetence" extends to "all issues of management of the current activity of the Company."  Articles of Ass'n ¶ 48.  Such tasks include implementing "the company's business plans," maintaining the accounting records and financial statements, managing the company's property, entering into contracts on behalf of the company, and exercising "the rights and obligations of the employer in relation to the company's employees." *Id.* ¶ 49.  This division of authority set forth in the Articles of Association—corporate governance performed by the Supervisory Board and day-to-day management by the Director General—is consistent with the presumption of separateness.

18

It also would appear that this is how the company actually functions in practice. Tajik Air has offered two sworn declarations of its General Director, Dilshod Ismatullozoda. *See* Ismatullozoda Decl.; 2d Ismatullozoda Decl. He states that, as the General Director, he is "responsible for the overall operation of Tajik Air and all matters in which Tajik Air is involved," Ismatullozoda Decl. ¶ 1, and the "Supervisory Board does not manage Tajik Air's operations," 2d Ismatullozoda Decl. ¶ 13; *see also* Ismatullozoda Decl. ¶ 12 (stating that the Director General "has full operating control of Tajik Air's day-to-day activities and is competent to address all operating and management issues"). He adds that the Supervisory Board has met only twice in the last two years—and only once since he began his position January 2019—and has not "issued any decisions, resolutions, or directives regarding the operations or management of Tajik Air." 2d Ismatullozoda Decl. ¶¶ 13–14. Skyroad offers no evidence to contradict Ismatullozoda's sworn statements. It does suggest, however, that the court should not credit them because Mr. Ismatullozoda did not join the organization until after the events at issue took place and thus does not speak from personal knowledge. *See* Hr'g Tr. at 44. The court is unpersuaded. Mr. Ismatullozoda's statements are offered to describe the governance structure, management, and operations of Skyroad, of which he has firsthand knowledge, not historic facts about the arbitration or the conflict over the aircraft leases. The court therefore credits Mr. Ismatullozoda's sworn declarations, which support the separateness of Tajikistan and Tajik Air.

*Third*, Tajikistan's appointment of high-government officials to the Supervisory Board was precipitated by the company's financial distress, and courts have been reticent to find the presumption of separateness overcome in such circumstances. That was the case in *Transamerica Leasing*, where the D.C. Circuit held that Venezuela's appointment of an executive to carry out CAVN's restructuring was not evidence of excessive control. *See* 200 F.3d at 851. If such action

were enough to overcome the presumption of separateness, the court observed, "the holding of *Foremost-McKesson* that majority stock ownership and control over the Board of Directors are insufficient to transform parent to principal and instrumentality to agent would be limited to cases in which the shareholder is utterly quiescent," which "is not the law." *Id.*; *see also BCI Aircraft Leasing, Inc. v. Republic of Ghana*, No. 06-cv-0130, 2006 WL 2989291, at *8–9 (N.D. Ill. Oct. 13, 2006) (finding fact that "[t]he Republic of Ghana removed the airline's Board of Directors and management 'in one fell swoop' and appointed [a] Government Task Force, a government agency, to serve as both board and management" to assist a "troubled subsidiary" was insufficient to establish a principal-agent relationship). Here, consistent with its status as sole shareholder, Tajikistan did not remain "utterly quiescent" in the face of Tajik Air's financial distress; it appointed high-government officials to oversee the company's financial recovery. Tajik Air did not lose its separate identity by the sovereign's actions.

Skyroad argues that this case is comparable to *Shoham v. Islamic Republic of Iran*, where another court in this District found the Iranian state-owned Bank Saderat was an agent of the state because it was "'funded, regulated by, and primarily owned by Iran.'" Pet'r's Opp'n at 26 (quoting No. 12-cv-508, 2017 WL 2399454, at *15 (D.D.C. June 1, 2017)). But that case, and those it relied on, are distinguishable from this one. Whereas Tajik Air was privatized in 2009, "Bank Saderat was nationalized by the Iranian government in 1979 and ha[d] operated as a state-run bank since." *Shoham*, 2017 WL 2399454, at *15. Moreover, beyond being funded and regulated by the state, the court in *Shoham* found Bank Saderat was "used by the Iranian government to further state policies of supporting and funding terrorist organizations around the world." *Id.* Accordingly, the court concluded that Iran "exercise[d] sufficient control over" the bank to make it "an agent of the state, barely distinguishable from an executive department of the government of Iran." *Id.*;

20

*see also TMR Energy*, 411 F.3d at 302 (finding same where the State Property Fund of Ukraine was used to "implement[] national policies" (internal quotation marks omitted)); *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995) (finding company was agent of Iran where the company carried out an anti-American government policy that was not commercial in nature but instead designed to injure American shareholders).  Here, in contrast, there is absolutely no evidence that the state uses Tajik Air, a commercial airline, to implement state policies.  As the D.C. Circuit suggested in *McKesson*, when "a government corporation is simply carrying out a state commercial policy as a normal part of the corporation's mission, without any state involvement, the state should be insulated from the corporation's actions."  52 F.3d at 352.  So it is here.

### 2.     *Actions in Underlying Arbitration*

Skyroad next argues that Tajik Air's actions in the underlying arbitration are evidence that it is an agent of Tajikistan.  *See* Pet'r's Opp'n at 4, 26–28; Hr'g Tr. at 42–44.  Recall that Tajik Air challenged the jurisdiction of the arbitral tribunal on the basis of a Lithuanian law that prohibits a state enterprise from entering an arbitration agreement without prior consent of the state.  *See* Pet'r's Opp'n at 27 (citing Award ¶ 65; Stmt. of Appeal ¶ 11).  That argument, made by a government attorney on Tajik Air's behalf, Skyroad contends, is evidence that Tajikistan so extensively controls Tajik Air that it is not permitted to enter into an arbitration agreement absent government consent.  *See* Hr'g Tr. at 41, 43.  But these facts lack the force and effect Skyroad would like them to have.

For starters, that Skyroad asserted a jurisdictional defense based on its status as a wholly owned state enterprise is not indicative of excessive control.  Such a defense is a litigation position, and, in terms of control, it is difficult to read anything more into it.  Nor is the fact that Tajik Air

was represented by Mr. Khafizov in the arbitration proceeding indicative of a principal-agent relationship. Tajik Air's Director General asserts that Mr. Khafizov was hired in his personal capacity and paid by Tajik Air, not the government of Tajikistan. *See* 2d Ismatullozoda Decl. ¶ 9. Maybe so. But even if Mr. Khafizov was acting on behalf of Tajik Air in his capacity as a government lawyer, such a modest mixing of government and corporate resources cannot bear the burden of overcoming the presumption of separateness afforded Tajik Air under *Bancec*.

Skyroad also points to a filing Tajik Air made in the Lithuanian Court of Appeal for an extension of time to comply with an order to pay Skyroad's litigation costs as evidence that Tajik Air is an agent of the state. *See* Hr'g Tr. at 42–43. Although the translation to English is far from clear, Tajik Air explains in the Lithuanian-court filing that it is a "state-owned entity of the Republic of Tajikistan, which determines both the complexity and length of the decision-adoption process." Pet'r's Opp'n, Ex. G, ECF No. 13-8, at 4. As a result, it states, "a longer period [is] required for the payment to reach the payee." *Id.* Skyroad argues that this language signifies government control over a "day-to-day operational decision[]" as simple as a "filing fee." Hr'g Tr. at 42. The court disagrees. The court does not read the request for more time made in the Lithuanian Court of Appeal to say, as Skyroad suggests, that the state must approve even modest-sized payments made by Tajik Air. Rather, the motion is better read to simply say that, because Tajik Air is a wholly owned state enterprise, litigation decisions require a more complicated and time-consuming set of consultations than in the case of a purely private company. Thus, the extension request supplies little evidence of an unusual level of state control.

\*     \*     \*

Accordingly, the court holds that the facts offered by Skyroad to show Tajikistan's control over Tajik Air, when viewed as a whole, are insufficient to satisfy the principal-agent exception to

*Bancec*'s presumption of separateness.  This conclusion is reinforced by those cases in which the Circuit has found the presumption to have been overcome.  *See e.g.*, *TMR Energy*, 411 F.3d at 302; *McKesson Corp.*, 52 F.3d at 351–52.  In *McKesson*, for example, the court considered whether Iran wielded sufficient control over a dairy ("Pak Dairy") for it to be considered an agent of the state.  52 F.3d at 351.  McKesson, an American corporation, "held 31 percent of the equity interest in Pak Dairy," and brought suit against Iran after its interest in the dairy was divested.  *Id.* at 347– 48.  Iranian "government entities held 52 percent of Pak Dairy's stock and controlled six of the seven seats on its board of directors."  *Id.* at 351.  The court observed that "Iran's alleged control over [the] Dairy was exercised through entities on [the] Dairy's Board, which were in turn controlled by Iran."  *Id.*  In finding that a principal-agent relationship existed between Iran and Pak Dairy, the court observed that "Pak Dairy's board and its government shareholders forced the dairy to disregard its commercial mission and its duties to McKesson as a shareholder."  *Id.*  "Iran's interest became the decisive factor in Pak Dairy's actions with regard to McKesson.  Routine business decisions, such as declaring and paying dividends to shareholders and honoring the dairy's contractual commitments, were dictated by Iran . . . ."  *Id.* at 351–52.  With regard to the act at issue, Pak Dairy's denial of dividends to McKesson, the court found "Iran's role was direct and manifest."  *Id.* at 352.  No such "direct and manifest" control by Tajikistan is evident in this case.

A similar degree of state control was present in *TMR Energy*.  There, the facts showed that "the State of Ukraine had plenary control over the [State Property Fund of Ukraine (SPF)]." 411 F.3d at 301.  The SPF, by its founding resolution, was deemed to be "a body of the State which implements national policies in the area of privatization" and "shall be subordinated and accountable to the Supreme Rada," the Ukrainian Parliament.  *Id.* at 326 (internal quotation marks

omitted).   Also, critically, "the SPF's expenses [were] paid from the budget of the State of Ukraine."  *Id.*  These "structural features," *id.,* present in *TMR Energy* are entirely absent here.

To be sure, the court does not read *McKesson* or *TMR Energy* to establish a factual floor for overcoming *Bancec*'s presumption of separateness.  Nevertheless, the factual circumstances in those cases stand in sharp contrast to those presented here.  It is fair to say that a spectrum of post-*Bancec* cases has emerged in this Circuit, and this case bears a far greater resemblance to *Transamerica Leasing* than to *McKesson* or *TMR Energy*.

## B.    Equity

Next, Skyroad contends that treating Tajik Air as separate from the state would "work fraud or injustice."  *Bancec*, 462 U.S. at 629 (internal quotation marks omitted).  Here again, Skyroad relies on Tajik Air's actions in the underlying arbitration, arguing that Tajik Air has since changed its position vis-à-vis its relationship to the state and therefore equity dictates the court treat Tajik Air and Tajikistan as one and the same.  *See* Pet'r's Opp'n at 26–28.  The court is unpersuaded.

The "work fraud or injustice" exception originated in *Bancec*.  That case involved a Cuban state-owned bank, Bancec, that brought suit against Citibank in U.S. District Court to collect on a letter of credit.  462 U.S. at 613.   When Cuba nationalized Citibank property after it had extended the letter of credit, Citibank sought to set off its debt against the value of its Cuban branches that had been nationalized.  *Id.* at 614–16.  Bancec argued that it should be able to collect on the letter of credit as a separate juridical entity but that it should not be subject to a set off because the FSIA immunizes an instrumentality of a foreign government from suit on a counterclaim based on actions taken by that government.  *Id.* at 619–20.  The court rejected Bancec's argument, characterizing it as "a foreign government" (Cuba) "invoking [U.S.] law" on the one hand, "but resisting a claim against it which fairly would curtail its recovery."  *Id.* at 632 (internal quotation

marks omitted).   "[Bancec] wants [U.S.] law, like any other litigant," the court observed, "but it wants [U.S.] law free from the claims of justice"  *Id.* (quoting *Nat'l City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 361–62 (1955)).   That is not what Tajik Air is attempting to do here.   It "is not attempting to use the federal courts as a sword while invoking the Constitution as a shield." *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59, 77 (D.D.C. 2009).   Instead, it is Skyroad that has haled Tajik Air into federal court in the United States, and Tajik Air is simply arguing that it does not belong here.

Skyroad's reliance on *Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion* (*COMMISA*), 832 F.3d 92 (2d Cir. 2016), is equally unpersuasive.   That case involved an arbitration award stemming from a contract between Pemex-Exploración Y Producción ("PEP"), a Mexican state-owned enterprise, and Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. ("COMMISA"), a subsidiary of a U.S. company, for the construction of oil platforms in the Gulf of Mexico.  *See id.* at 97.   When the relationship between the parties soured, PEP rescinded the contract, and COMMISA ultimately prevailed in arbitration.  *See id.* at 98–99.   After judgment confirming the award was entered in the Southern District of New York, the Eleventh Collegiate Court in Mexico set aside the award after finding that PEP, "as an entity deemed part of the Mexican government, could not be forced to arbitrate." *Id.* at 97.   On appeal to the Second Circuit, PEP argued that the judgment confirming the award should be set aside for, among other reasons, lack of personal jurisdiction.  *Id.* at 100.   Specifically, PEP argued that it lacked minimum contacts with the United States and that the lower court had erred in finding it was not entitled to due process protections as a foreign state-owned instrumentality.  *See* Br. for Resp't-Appellant at 24, *COMMISA*, No. 10-4656 (2d Cir. Jan. 28, 2014), 2014 WL 487235, at *24 [hereinafter Appellant's Br.].   Later in the very same brief,

however, PEP argued that nullification of the arbitral award by the Mexican court should be respected because "'the view that *public* entities can abrogate contracts for reasons unavailable to private parties is hardly alien to American law.  For example, *the U.S. Government* can block breach-of-contract suits against it by asserting that the litigation would reveal state secrets.'" *COMMISA*, 832 F.3d at 104 (quoting Appellant's Br. at 53).  In other words, PEP equated itself with a sovereign government.  The court rejected PEP's claim to due process rights, explaining "PEP's assertion (in arguing the merits) that it is integral to the Mexican government binds it for all portions of this appeal, including personal jurisdiction."  *Id*.  Here, at no point has Tajik Air represented to this court that it is functionally equivalent to the Republic of Tajikistan yet contradictorily asserted that it is entitled to due process protection.

Nor is it clear that Tajik Air made any representation of identity with the state in the underlying arbitration or before the Lithuanian Court of Appeal, as Skyroad contends.  In both proceedings, Tajik Air asserted that the arbitral tribunal lacked jurisdiction to hear the dispute because, under the commercial arbitration law of Lithuania, where the arbitration took place, a state-owned entity like Tajik Air lacks the legal capacity to arbitrate without consent from the state, and Tajikistan never granted such consent with respect to the Skyroad aircraft leases.  *See* Award ¶¶ 64–65; Stmt. of Appeal at ¶¶ 7–27.  Nothing about that jurisdictional argument is inconsistent with the position Tajik Air now takes.  In theory, Tajik Air could have been required under Lithuanian law to obtain the consent of its sovereign owner before having the capacity to arbitrate, yet still remained a legally separate enterprise.  Tajik Air never asserted in the underlying proceedings that there was no separation between it and the state.  Accordingly, Skyroad has failed to show that "recognition of [Tajik Air] as an entity apart from the state 'would work fraud or injustice.'"  *Transamerica Leasing*, 200 F.3d at 848 (quoting *Bancec*, 462 U.S. at 629).

26

\*       \*       \*

Having failed to provide facts sufficient to satisfy either exception to *Bancec*'s presumption of separateness, the court must consider Tajik Air as a "person" for Fifth Amendment due process purposes. *GSS Grp.*, 680 F.3d at 816–17. Because Skyroad makes no averment that Tajik Air has any contacts with the United States, the court concludes that it lacks personal jurisdiction over Tajik Air.

## V.    CONCLUSION

For the foregoing reasons, Respondent's Motion to Dismiss, ECF No. 12, is hereby granted. A separate final Order accompanies this Memorandum Opinion.

Dated:  January 26, 2021

_____
Amit P. Mehta
United States District Court Judge

27